**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| **UNITED STATES SECURITIES** | ) |
| **AND EXCHANGE COMMISSION,** | ) |
| | ) |
| | ) **Miscellaneous Case No.** |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **EQUITYBUILD, INC.,** | ) |
| **EQUITYBUILD FINANCE, LLC,** | ) |
| **JEROME H. COHEN, and** | ) |
| **SHAUN D. COHEN,** | ) |
| | ) |
| **Defendants.** | ) |

_____)

**NOTICE OF RECEIVERSHIP PURSUANT TO  28 U.S.C. § 754**

Pursuant to 28 U.S.C. § 754, the Receiver in the above captioned matter files the

attached documents: Exhibit 1, Complaint captioned *U.S. Securities & Exchange*

*Commission v. EquityBuild, Inc., et al.,* Case No. 18-cv-5587 pending in the Northern

District of Illinois; and Exhibit 2, Order Appointing Receiver in same case.


Dated:  August 24, 2018          By:     /s/ Nicole Mirjanich
                  Nicole Mirjanich
                  Rachlis Duff Adler Peel
                   & Kaplan, LLC
                  542 S. Dearborn St., Suite 900
                  Chicago, IL 60605
                  Phone  (312) 733-3950
                  Fax     (312) 733-3952
                  nm@rdaplaw.net

# Exhibit 1

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) Civil Action No. ) |
| v. | ) 18-CV-5587 ) |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("SEC") alleges as follows:

1.     The SEC brings this action to halt an ongoing Ponzi scheme.  Since at least 2010, Defendants Jerome and Shaun Cohen, through their companies, Defendants Equitybuild, Inc. and Equitybuild Finance, LLC, have raised at least $135 million from more than 900 investors.  Defendants raised these funds by falsely promising investors safe investments, secured by income-producing real estate, that generated returns of 12% to 20%.  Most of the real estate promoted to investors were residential properties in underdeveloped areas on the South Side of Chicago.

2.     Defendants defrauded their investors in multiple ways.  For instance, Defendants hid from investors that they skimmed 15% to 30% off each investment by taking undisclosed fees.  In many cases they did this by telling investors that the properties being purchased cost substantially more than what Defendants actually paid for them.  This meant that investors were not only overcharged, but the real estate supposedly securing their investments was worth much less than what Defendants told investors.

3.      Beyond the exaggerated property valuations and undisclosed fees, Defendants falsely told investors that their impressive returns would be generated by profitable real estate.  Contrary to Defendants' claims, Defendants sustained heavy losses and the properties they pitched to investors failed to earn anywhere near enough to pay the promised double-digit returns.  As a result, Defendants' investment program devolved into a Ponzi scheme:  Defendants could only pay earlier investors by raising funds from unwitting new investors.

4.      Rather than disclosing their financial problems, to keep the scheme afloat the Defendants continued to solicit investors with offers of safe investments and outsized returns.

5.      Defendants later changed their business model by offering investments in pooled investment funds, again promising double-digit returns generated by income-producing real estate.  But Defendants concealed from new investors that most of the properties supposedly being acquired and renovated by new investor proceeds were the very same properties "securing" the investments of earlier investors.  Defendants also hid from the new investors that, rather than be deployed to develop real estate, significant amounts of their money would be used to make Ponzi payments to earlier investors.

6.      As for the earlier investors, Defendants forced them to restructure their investments by pushing back the timeframes for repayment, swapping investors' supposedly secured investments for new unsecured instruments, and by transferring title of the properties purportedly securing the investments into special purpose entities owned by Defendant Jerome Cohen.

7.      On the brink of their scheme collapsing, Defendants recently started coming clean about their financial distress and inability to repay investors through revenue-producing real estate.  But Defendants limited these disclosures only to earlier investors whose interest payments Defendants could no longer afford to make.  Despite these partial disclosures, Defendants continue

to raise funds from new investors by concealing their dire financial condition while promising "guaranteed" returns and annual interest payments as high as 17%. This lawsuit seeks to stop Defendants' scheme.

## JURISDICTION AND VENUE

8.      The SEC brings this action under Securities Act of 1933 ("Securities Act") Section 20(b) [15 U.S.C. §77t(b)] and Securities Exchange Act of 1934 ("Exchange Act") Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)].

9.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business constituting the violations alleged herein have occurred within the Northern District of Illinois.

11.     Nearly all of the securities described herein involved real estate investments in Chicago. Defendants operate an office in Chicago and used investor funds to purchase, renovate, and develop Chicago residential properties. Defendants also offered and sold the securities described herein to investors in the Northern District of Illinois.

12.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

13.     **Equitybuild, Inc.** is a Florida corporation, with an office in Chicago. Since at least 2010, Equitybuild, Inc. ("Equitybuild") has solicited investments promising returns generated by the purchase, renovation, and development of real estate in Chicago.

14.     **Equitybuild Finance, LLC**, formerly known as Hard Money Company, LLC, is a Delaware limited liability company wholly owned by Equitybuild.  Since at least 2010, Equitybuild Finance, LLC ("Equitybuild Finance") has solicited investments promising returns generated by the purchase, renovation, and development of real estate in Chicago.

15.     **Jerome H. Cohen**, age 63, is a resident of Naples, Florida.  Jerome Cohen founded Equitybuild and Equitybuild Finance.  He is the CEO and President of Equitybuild.  Along with his son Shaun, Jerome Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

16.     **Shaun D. Cohen**, age 39, is a resident of New York, New York.  He is the President and sole officer of Equitybuild Finance and the Vice President of Equitybuild.  Along with his father, Shaun Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

## **FACTS**

17.     Since 2010, Defendants Equitybuild, Equitybuild Finance, Jerome Cohen and Shaun Cohen (collectively, "Defendants") have raised at least $135 million by selling securities to more than 900 investors throughout the United States.

18.     None of the securities or securities offerings described herein was registered with the SEC.

19.     While the mechanics of the investments changed over time, Defendants offered and sold securities by promising to pool investor funds to purchase, renovate, or develop real estate properties, primarily in underdeveloped areas on the South Side of Chicago.

4

**Phase 1: The Private Mortgage Notes**

20.     By 2010, Defendants had begun offering and selling promissory notes (the "Notes") to investors.

21.     The parties to the Notes were:  (a) the "borrower," which was usually Equitybuild, and (b) the investors, each of which the Notes described as a "lender."

22.     The Notes provided for interest rates ranging from 12% to 20%, with investors receiving higher interest rates for investing greater amounts of money.

23.     The terms of the Notes ranged from six to 24 months.  At the end of the Notes' terms, Defendants offered investors the option of, instead of returning investors' principal, rolling over the principal into a new Note.  Many investors availed themselves of this option.

24.     Each Note referenced a specific real estate property, which investor funds would purportedly be pooled to purchase, renovate, and/or develop.  Each Note represented that the Note was secured by a fractional interest in a mortgage in the identified property.

25.     However, per the investment forms Defendants drafted, the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and powers under the Notes and mortgages.  Defendants thus structured the mortgages to be typically entered between:  (a) Equitybuild, an affiliate entity, or, in some case, a third-party purchaser; and (b) the investors "care of" Equitybuild Finance.

26.     Jerome Cohen signed the Notes and mortgages on behalf of Equitybuild (or its affiliates).  Shaun Cohen, having been delegated the ability to do so by the investors, signed the Notes on behalf of Equitybuild Finance.

**Defendants Promoted the Notes as Profitable and Safe Investments Secured by Real Estate**

27.     Defendants utilized a variety of promotional methods to solicit investments in the Notes.  These included Equitybuild's website, emails to prospective investors, a call center and salespeople, in-person presentations, social media, and Google advertising.

28.     As part of their marketing efforts, Equitybuild and Equitybuild Finance also issued and distributed to investors promotional booklets referred to as "white papers."

29.     The salespeople Defendants used to solicit investors received commissions based on the amounts of investments they obtained.  These salespeople ultimately reported to Shaun Cohen, who instructed them to bring in at least $50,000 in new investments each day.

30.     Defendants' promotional materials touted the Notes as "low risk" investments that were secured by real estate.  For instance, in one white paper, Defendants described how "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever."  The same white paper describes Equitybuild's "Three Guarantees," which included promises that Equitybuild would compensate investors for any deficiencies in the real estate's operating income and declines in property values.

31.     In another white paper, Equitybuild Finance assured investors that if the mortgage ever goes into default, investors could simply sell the property in a quick sale and get their money out of the investment.

32.      Defendants also sought to downplay the risk of investing by describing their purportedly successful track record.  Marketing emails frequently touted the fact that "EquityBuild has Never Defaulted on a Loan and has Zero Foreclosures," and had a "perfect payment track record."  Equitybuild's website and white papers similarly claimed that it was

able to achieve "Operational Mastery" due to a "proprietary econometric model" that successfully identifies undervalued properties.

33.     Defendants paired their assurances of low risk investments with the lure of "consistently" delivering "double-digit returns."  Defendants touted how their "investors receive impressive, double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on their part."

34.     Defendants told investors that their double-digit returns would be generated through third-party purchasers, who would use the investor-funded mortgages to purchase the properties securing the Notes.  Defendants told investors that these third-party purchasers borrow on shorter terms and at higher rates than purchasers using traditional mortgages, allowing Equitybuild and Equitybuild Finance to generate "high returns that beat the stock market."

35.     Defendants told investors that Equitybuild and Equitybuild Finance earned their profits from the third party purchasers, but not from the investors.  To that end, Defendants told investors that Equitybuild and Equitybuild Finance retained as profits the difference between the mortgage payments received from the third party purchases and the interest payments made to the Note investors.

36.     Reinforcing the safety and profitability of the Notes, Defendants' marketing emails claimed that these third-party purchasers were "qualified" borrowers with "A-grade" credit.  Defendants also represented that the properties collateralizing investors' Notes would generate "more than enough revenue to cover the borrower's note payments as well as all of the property's operating expenses, and still return positive cash flow."

**In Reality, Defendants Charged the Note Investors Heavy Undisclosed Fees, Purchased Poorly Performing Real Estate, and Began Operating a Ponzi Scheme**

37.     Defendants' representations that they made money by keeping the difference between the mortgage payments of third-party purchasers and the Note investors' interest payments were false and misleading.  Contrary to these representations, and concealed from investors, Defendants kept 15% to 30% of the Note investors' investments as undisclosed fees.

38.     Defendants kept these fees hidden by telling investors that the properties securing their Notes were worth significantly more than the actual cost of the properties.  Specifically, the offering memoranda Defendants provided to Note investors listed a "purchase price" or "sale price" for each property that was inflated, on average, by more than 47%.  This meant Defendants collected far more money from investors than what they told investors was necessary to acquire the properties securing each Note.

39.     Jerome and Shaun Cohen used these secret fees to fund their personal living expenses, and to keep the scheme going by making Ponzi-style payments to earlier investors.

40.     The inflated purchase prices presented to investors also meant that the investments were far riskier than Defendants led investors to believe.  Indeed, the Notes were not, as Defendants claimed, "fully" or "100%" secured by real estate at the price disclosed to investors.  Rather, to the extent they were secured at all, the Notes were only secured by the actual, and much smaller, value of the properties.

41.     Beyond the undisclosed fees, Defendants deceived investors by falsely representing that the properties securing the Notes were profitable investments that generated positive cash flows.

42.     In reality, and unknown to investors, many of properties securing the Notes performed quite poorly, with monthly expenses far exceeding their revenues. This meant that few, if any, of the properties generated enough revenues to fund the investors' interest payments.

43.     Despite Defendants' claims of successful real estate investments, Equitybuild's internal financial statements, which were not shared with investors, revealed a net loss for 2015 of $12 million.

44.     Contrary to Defendants' representations, investors' interest payments were not funded by third-party buyers' mortgage payments. Rather than selling the properties to third-party purchasers, Equitybuild owned most of properties securing the Notes. And by 2015, Defendants no longer even tried to find third-party buyers.

45.      With the properties failing to generate sufficient income, Defendants began operating the Notes offering as a Ponzi scheme, using new investor funds to pay earlier investors' interest payments. From January 2015 through February 2017, investors received approximately $14.5 million in interest payments. During that same period, the revenue earned from properties' rental income and third party buyers' monthly payments amounted to only $3.8 million. Defendants never told investors that they were relying on fresh investor funds, rather than income-producing properties, in order to finance the interest payments.

46.     Given the poor performance of many of their properties, Defendants' claim of having "zero foreclosures" was also misleading. Indeed, even in the event of a default by the borrower, it would have been impossible for investors to foreclose.

47.     This is because, as part of the Note investments, investors delegated to Equitybuild Finance all of their powers under the Notes and mortgages, including the power to foreclose. And, even absent that delegation, there was no practical way for investors to

foreclose, since there were multiple investors on each property and Defendants did not provide investors with the other investors' contact information.

48.     Similarly misleading were Defendants' representations that they had never defaulted on a loan.  Defendants routinely extended the payback terms on investors' Notes, often for years. Defendants forced investors to either agree to these extensions or be placed on a "buyout list" and wait for Defendants to find another investor willing to buy out the original investment.  As of June 2018, Defendants had approximately $3 million worth of investments on the buyout list.

49.     Defendants also forced approximately 100 investors to accept unsecured promissory notes in lieu of their original "secured" Notes.  Nevertheless, Defendants continued to offer securities to new investors without disclosing that previous investors had been compelled to extend their payback terms, been placed on the buyout list, or had their secured Notes switched to unsecured notes.

50.     And, despite touting Defendants' successful track record and "Operational Mastery," Defendants failed to disclose to investors that Jerome and Shaun Cohen had each previously filed for bankruptcy.

51.     Nor did Defendants actually employ an "econometric model" to select properties, as the offering materials represented.  Unbeknownst to investors, and as Jerome Cohen acknowledged to SEC investigators, the "econometric model" represented to investors was merely some "back of the envelope" calculations and selecting real estate was not a "core competency" of Defendants.

**Phase 2:  Defendants Begin Offering Investments in Real Estate Funds**

52.     In 2017, Jerome and Shaun Cohen began making changes to the business model they presented to investors.  But while the mechanics of the investments changed, the fraud continued.

10

53.     At that time, rather than offering promissory notes, they began offering investments in real estate "funds."  To date, Defendants have offered a total of over $70 million in investments in at least seven different funds.  Defendants told investors in these funds that Defendants would pool investor proceeds to purchase and renovate real estate, again primarily on the South Side of Chicago.

54.     With names like "Chicago Capital Fund," and "South Side Development Fund," Defendants continued to promise investors double-digit returns.  These fund offerings remain ongoing, with one fund offering 17% returns for 24 months, and another offering 14% returns in as short as six months.  One fund promises "guaranteed" returns.

55.     As was the case with the Notes, the funds' offering materials tout the profitably of the investment, while failing to disclose Defendants' poor performance record, precarious financial condition, and operation of a Ponzi scheme.

56.     For instance, Defendants failed to disclose to the fund investors that, rather than being deployed to purchase or renovate real estate, Defendants used significant portions of fund investor money to repay earlier Note investors.

57.     Defendants also concealed from investors that many of the properties that make up these new funds are the very same properties that purportedly secured prior investors' Notes. Without prior disclosure to the Note investors, Defendants transferred title of properties purportedly securing the Notes to special purpose entities owned by Jerome Cohen.

58.     While the funds' offering materials list the properties the funds intend to acquire, they fail to mention that the Defendants acquired those buildings in the course of the earlier Note offerings and that the properties supposedly served to secure the prior Note investments.

59.     While touting the profitability of the funds, the funds' offering materials also fail to disclose Defendants' inability to repay earlier investors.  According to Equitybuild's records,

as of late 2017, investors in more than 1,200 Notes had not been repaid their principal, totaling almost $75 million in delinquent payments.  Defendants concealed this fact and also their inability to make earlier investors whole.  Demonstrating the unlikelihood that Defendants can repay investors, as of May 31, 2018, Equitybuild and Equitybuild Finance had less than $100,000 in their bank accounts.

**The Fraud Continues: Even on the Brink of Collapse, Defendants Continue to Solicit Investors by Offering Outsized Returns and Hiding Their Severe Financial Problems**

60.     Defendants recently started coming clean about their failed investments and dire financial condition – but only to earlier investors and not to prospective investors from whom Defendants continue to solicit fresh investments.

61.     In May and June of 2018, Defendants disclosed to earlier investors that they were unable to continue making interest payments on the Notes and that they were in the process of unilaterally changing the terms of investors' investments.

62.     At that time, Shaun Cohen emailed prior investors that Equitybuild had accumulated a "debt load that is not sustainable" and that continuing to pay investor interest payments "would lead to an inevitable disaster that would put your investment at risk of significant loss."  Shaun Cohen further wrote that Equitybuild had "no choice but to restructure and reduce the debt burden" by unilaterally converting investors' Notes or unsecured promissory notes to equity positions in one of the funds.

63.     In early August 2018, Equitybuild emailed a video recording of Shaun Cohen to Note investors.  On the recording, Shaun Cohen:  (a) states that Equitybuild's properties are "negatively cash flowing," (b) acknowledges that investor interest payments have stopped and that principal has not been returned, (c) discloses that Equitybuild had funded investor interest payments using "fee income" from later investors, but that fees charged to later investors could

no longer satisfy the interest payments to earlier investors, (d) warns investors not to file lawsuits against Equitybuild, (e) states that investors will not receive payments until Equitybuild's rental income exceeds its expenses, and (f) advises that Equitybuild was cutting staff down to a "skeleton crew" and would not be able to respond to investor inquiries.

64. While making these stark admissions to earlier investors, Defendants provide no such warning to the unwitting investors to whom they currently offer fund securities. Instead, Defendants continue to raise new money, promising "guaranteed" returns and annual interest payments as high as 17% – all while hiding Defendants' severe financial problems and the fact that they told earlier investors they could no longer make their interest payments.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
### (Against All Defendants)

65. Paragraphs 1 through 64 are realleged and incorporated by reference.

66. As more fully described in paragraphs 1 through 64, Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

67. As described in more detail in paragraphs 1 through 64 above Defendants each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

13

68.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b) (Against Defendants Jerome Cohen and Shaun Cohen)

69.     Paragraphs 1 through 64 are realleged and incorporated by reference.

70.     Defendants Equitybuild and Equitybuild Finance, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

71.     Defendants Jerome Cohen and Shaun Cohen knowingly or recklessly provided substantial assistance to Defendants Equitybuild and Equitybuild Finance in the commission of these violations.

72.     Defendants Jerome Cohen, Shaun Cohen, Equitybuild and Equitybuild Finance acted with scienter and/or recklessly.

73.     By reason of the foregoing, Equitybuild and Equitybuild Finance violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Jerome Cohen and Shaun Cohen are liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT III

### Control Person Liability Under Section 20(a) of the Exchange Act
### (Against Jerome Cohen and Shaun Cohen)

74.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

75.     Jerome Cohen and Shaun Cohen (a) directly or indirectly controlled Defendants Equitybuild and Equitybuild Finance, (b) possessed the power and ability to control Defendants Equitybuild and Equitybuild Finance as to their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (c) were culpable participants in Defendants Equitybuild's and Equitybuild Finance's violations of the Exchange Act, including by knowingly or recklessly authorizing and causing Equitybuild and Equitybuild Finance to make the false and misleading representations and omissions described herein and use investor proceeds in the manner described herein.

76.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Jerome Cohen and Shaun Cohen are jointly and severally liable with, and to the same extent as, Defendants Equitybuild and Equitybuild Finance for their violations of the Exchange Act as stated above in Count I.

## COUNT IV

### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

77.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

78.     By engaging in the conduct described in paragraphs 1 through 64 above, Defendants, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly:

    a.  employed devices, schemes and artifices to defraud;

    b.  obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.  engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

79.     Defendants intentionally, recklessly, and negligently engaged in the conduct described above.

80.     By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT V

### Violations of Section 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

81.     Paragraphs 1 through 64 above are realleged and incorporated herein by reference.

82.     By their conduct, Defendants directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

83. By reason of the foregoing, Defendants have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants, on a joint and several basis, to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

**IV.**

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

Respectfully Submitted,

Dated: August 15, 2018

 /s/ Benjamin J. Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Ariella Guardi (guardia@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398
Attorneys for Plaintiff
U.S. Securities and Exchange Commission

# Exhibit 2

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| _____ | ) |
| **UNITED STATES SECURITIES** | ) |
| **AND EXCHANGE COMMISSION,** | ) |
| | )     **Civil Action No.** |
|            **Plaintiff,** | ) |
|     **v.** | ) |
| | )     **Hon. Judge** |
| **EQUITYBUILD, INC.,** | ) |
| **EQUITYBUILD FINANCE, LLC,** | ) |
| **JEROME H. COHEN and** | ) |
| **SHAUN D. COHEN** | ) |
| | ) |
|            **Defendants,** | ) |
| _____ | ) |

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon Plaintiff United States

Securities and Exchange Commission's ("SEC" or "Commission") Emergency Motion for a

Temporary Restraining Order to Prevent Violations of the Federal Securities Laws, to Appoint a

Receiver, and to Provide for Other Ancillary Relief; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the

appointment of a receiver in this action is necessary and appropriate for the purposes of

marshaling and preserving all assets of Defendants Equitybuild, Inc., Equitybuild Finance, LLC,

their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen; and,

**WHEREAS** this Court has subject matter jurisdiction over this action and personal

jurisdiction over the Defendants, and venue properly lies in this District.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

**THAT:**

     1.      This Court hereby takes exclusive jurisdiction and possession of the assets, of

whatever kind and wherever situated, of the following Defendants, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen:  Equitybuild, Inc., Equitybuild Finance, LLC, and affiliates, including but not limited to:  3400 Newkirk, LLC, Hard Money Company LLC, Tikkun Holdings LLC, 11117 S Longwood LLC, 11318 S Church St Associates, 1632 Shirley LLC, 1700 Juneway LLC, 2136 W 83RD LLC, 2537 N McVicker LLC, 4520 S Drexel LLC, 4533-37 S Calumet LLC, 4528 Michigan LLC, 4750 Indiana LLC, 4755 S Saint Lawrence Associates, 5001 S Drexel LLC, 5411 W Wrightwood LLC, 6951 S Merrill LLC, 7107-29 S Bennett LLC, 7109 S Calumet LLC, 7922 S Luella LLC, 7927-49 S Essex LLC, 7933 S Kingston LLC, 7945 S Kenwood LLC, 8104 S Kingston LLC, 8153 S Avalon LLC, 8217 Dorchester LLC, 8311 S Green LLC, 8432 S Throop Associates, 8725 S Ada LLC, 8745 S Sangamon LLC, 8801 S Bishop St Associates, 9158 S Dobson LLC, Chicago Capital Fund I LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB South Chicago 3 LLC, Hybrid Capital Fund LLC, South Shore Property Holdings LLC, South Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC, South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, and South Side Development Fund 8 LLC (collectively, the "Receivership Defendants").

2.     Until further Order of this Court, Kevin B. Duff, of the firm Rachlis Duff Adler Peel & Kaplan, LLC, is hereby appointed to serve without bond as the federal equity receiver (the "Receiver") for the estate of the Receivership Defendants.

## I. <u>Asset Freeze</u>

3.     Except as otherwise specified herein, all assets of the Defendants and Receivership Defendants (collectively, "Receivership Assets") are frozen until further order of this Court.  "Receivership Assets" means assets of any and every kind whatsoever, including

without limitation all assets described in this Order, that are: (a) owned, controlled, or held, in whole or in part, by or for the benefit of any of the Receivership Defendants, in whole or in part; (b) in the actual or constructive possession of any of the Receivership Defendants, or other individual or entity acting in concert with any of the Receivership Defendants; (c) held by an agent of any of the Receivership Defendants, including as a retainer for the agent's provision of services; or (d) owned, controlled, or held, in whole or in part, by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned, controlled, or held, in whole or in part, by any of the Receivership Defendants, including assets that have been transferred to other persons or entities but as to which assets such persons or entities do not have a legitimate claim. Accordingly, all persons, institutions and entities with direct or indirect control over any Receivership Assets other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such Receivership Assets. This freeze shall include, but not be limited to, Receivership Assets that are on deposit with any financial institutions or other entities, including, but not limited to, banks, brokerage firms and mutual funds. In particular, the Court enjoins any disbursement of proceeds by the Defendants, their agents, representatives, employees and officers and all persons acting in concert or participation with them, whatever business name they may operate under, derived from the sales of interests in Receivership Defendants, or any of them.

## II. **General Powers and Duties of Receiver**

4.      The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, members, and general and limited partners of the

3

Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, Fed. R. Civ. P. 66, and this Order.

  5. The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys, and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended.  Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. This order, however, does not dismiss Defendants Jerome Cohen and Shaun Cohen's personal attorneys, if any, who file an appearance in this action.

  6. The Receiver shall assume and control the operation of any of the Receivership Defendants and shall pursue and preserve all of their claims or interests.  The Receiver may continue and conduct the business of the Receivership Defendants in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all.

  7. No person holding or claiming any position of any sort with any of the Receivership Defendants shall possess any authority to act for or on behalf of any of the Receivership Defendants, unless expressly authorized, in writing, by the Receiver.

  8. Subject to the specific provisions in Sections II through XIII, below, the Receiver shall have the following general powers and duties:

    A. To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, investments, savings, options, shares, cash, currencies, checks, accounts, vehicles, boats, equipment, fixtures, effects, goods, chattels, lands, premises, leases, claims, notes, membership interests in any limited liability company, partnership

4

interests, contracts, certificates of title, instruments, inheritances, interests in any trust, art, collectibles, furnishings, jewelry, personal effects, digital currencies, virtual currencies, cryptocurrencies, digital or electronic property, rights, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind and wherever located, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly (the foregoing, together with all assets described in this Order collectively may be referred to as "Receivership Assets" or the "Receivership Estate");

B.      To take custody, control, and possession of all Receivership Assets and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Assets and records relevant thereto;

C.      To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Assets, pending further Order of this Court;

D.      To take possession of all bank and investment accounts or securities accounts owned controlled, or held, in whole or in part, by or associated with the Receivership Estate or Receivership Defendants, whether in the name of the Receivership Defendants or their subsidiaries or affiliates, wherever located (collectively, the "Accounts"). The Receiver shall have the authority to open, close, transfer and change all bank, investment and securities Accounts.

E.      To sign checks on, otherwise withdraw or transfer, trade, or otherwise control the funds and/or securities contained in any Accounts owned, controlled, or held, in whole or in part, by, or in the name of, the Receivership Defendants and Receivership Estate. The Receiver shall also be authorized to add or delete signers, including those currently authorized on the Account(s). The representatives of the Receiver initially designated with authority over these accounts shall be Kevin B. Duff.

F.      To open and maintain new bank accounts in the name of the Receiver for the use in administering and preservation of the Receivership Estate, using the Federal Employer Identification Number of the Receivership Estate, at the Receiver's discretion.

G.      To take control of, conserve, and liquidate any and all securities or commodities, owned, controlled, or held by, in whole or in part, by or for the benefit of the Receivership Estate, as the Receiver deems advisable or necessary.

H.      To use Receivership Assets for the benefit of the Receivership Estate,

making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

I.    To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, members, trustees, and agents of the Receivership Defendants;

J.    To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

K.    To take such action as necessary and appropriate for the preservation of Receivership Assets or to prevent the dissipation or concealment of Receivership Assets;

L.    To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

M.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

N.    To pursue, resist and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estate;

O.    To take such other action as may be approved by this Court.

### III.  Defendants' Duties to Receiver

9.    The individual Receivership Defendants and the past and/or present officers, directors, agents, managers, members, general and limited partners, trustees, attorneys, accountants and employees of the entity Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve, provide immediate access, and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Assets; such information shall include but not be limited to books, records, documents, accounts, all financial and accounting records, balance

sheets, income statements, bank records (including monthly statements, canceled checks, records

of wire transfers, details of items deposited, and check registers), client lists, title documents,

writings, drawings, graphs, charts, photographs, audio and video recordings, computer records,

computer files, databases and other data compilations, electronically stored records and

information, access codes, security codes, passwords, safe deposit keys, combinations, and all

other instruments, papers, and electronic data or records of any kind or nature. This does not,

however, include any documents or files of Defendant Jerome Cohen's or Defendant Shaun

Cohen's personal attorneys, if any, that are protected by the work-product doctrine and/or

attorney-client privilege. Notwithstanding the foregoing, the Receivership Defendants and any

person or entity receiving notice of this Order shall turn over to the Receiver forthwith all keys,

including but not limited to physical, digital, and cryptographic keys, codes, device PINs, and

passwords, including but not limited to account, encryption, email account, and computer

passwords, necessary to gain or to secure access to any Receivership Assets or documents of or

pertaining to the Receivership Defendants, including, but not limited to, access to their business

premises, means of communication, accounts, computer systems, mail boxes, lock boxes, storage

facilities, virtual currency accounts, virtual wallets, or other property.

10.     Within five (5) business days of the entry of this Order, the Receivership

Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn

statement, listing: (a) the identity, location and estimated value of all Receivership Assets,

including contact information for the party in possession of, all assets of such Defendant, held

jointly or singly, including without limitation all assets held outside the territory of the United

States; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any

other agents or contractors of the Receivership Defendants; and (c) the amount and nature of all

liabilities of such Defendant, including without limitation the names, addresses and amounts of claims of all known creditors of the Receivership Defendants. Such sworn statement shall include the names, addresses, telephone numbers, facsimile numbers, and e-mail addresses of the holders of any legal, equitable, or beneficial interests in such assets and the names, addresses, telephone numbers, facsimile numbers, and e-mail addresses of any financial institutions or other persons or entities holding such assets, along with the account numbers and balances. The sworn statements shall be accurate as of the date of this Order, shall be signed and verified as true and complete under penalty of perjury. Defendants Jerome Cohen and Shaun Cohen shall retain responsibility, and the Receiver shall assume no responsibility, for preparing and filing their respective personal income tax returns.

11.     Within thirty (30) days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement and accounting, with complete documentation, covering the period from January 1, 2010 to the present:

    A.    Of all Receivership Assets, wherever located, held by or in the name of the Receivership Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

    B.    Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendants;

        C.      Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

        D.      Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

        E.      Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

        G.      Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

        H.      Of all transfers of assets made by any of them.

12.      Within ten (10) days of the entry of this Order, the Receivership Defendants shall provide to the Receiver and the Commission copies of the Receivership Defendants' federal income tax returns for 2010 through 2017 with all relevant and necessary underlying documentation. The Receivership Defendants shall also deliver all state licenses, tax identification numbers, and all other relevant tax information.

13.      The individual Receivership Defendants and the Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, members, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants.

In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make his discovery requests in accordance with the Federal Rules of Civil Procedure. Nothing in this Order shall operate as or effectuate a waiver of the attorney-client privilege regarding communications between Defendants Jerome Cohen and Shaun Cohen and their respective personal attorneys, if any, and such personal attorneys shall not be compelled by this Order to divulge information that would otherwise be protected by the attorney-client privilege.

14. The Receivership Defendants are required to fully cooperate with and assist the Receiver in all respects in fulfilling his duties and obligations. As such, the Receivership Defendants must respond promptly and truthfully to all requests for information and documents from the Receiver. This cooperation and assistance shall include, but not be limited to: (a) providing any information or documents that the Receiver deems necessary or appropriate to the exercise of the Receiver's authority and the discharge of the Receiver's responsibilities under this Order; (b) providing any keys, including but not limited to physical, digital, and cryptographic keys, codes, device PINs, and passwords, including but not limited to account, encryption, email account, and computer passwords required to access any computer, electronic file, or telephonic data in any medium; (c) immediately advising all Persons who owe money or currency of any kind to the Receivership Defendants that all debts should be paid directly to the Receiver; (d) providing full access to all Receivership Assets; and (e) maintaining and not wasting, damaging, disposing of, or transferring in any manner any Receivership Assets.

### IV. Access to Books, Records and Accounts

15. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments

relating to the Receivership Defendants. All persons and entities having control, custody, or possession of any Receivership Assets are hereby directed to turn such property, including but not limited to all Accounts, over to the Receiver.

16. The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any Receivership Assets, including without limitation assets or funds held by, in the name of, or for the benefit of, directly or indirectly; and of the Receivership Defendants that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

    A.    Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

    B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

    C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

    D.    Cooperate expeditiously in providing access to accounts, assets and funds, as well as information as well as transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. Access to Real and Personal Property

18.     The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, automobiles, and equipment.

19.     The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures.  Upon receiving actual notice of this Order by personal service, facsimile transmission, or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from entering such premises, removing anything from such premises, or destroying, concealing, or erasing anything on such premises.  Notwithstanding the foregoing, the individual Receivership Defendants, or any of their respective family members, shall be permitted to continue residing in their respective primary places of residence, until further notice by the Receiver.

20.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the real property and premises described above.  The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership unless expressly permitted in advance by the Receiver in writing.

21.     The Receiver is authorized to open all mail, other than mail addressed to Defendant Jerome Cohen's spouse or daughter; or Defendant Shaun Cohen's spouse or children, directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver, the U.S. Marshals Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.  In addition, the Receiver is authorized to request similar assistance from any other federal, state, county, or civil law enforcement officer(s) or constable(s) of any jurisdiction.

## VI. <u>Notice to Third Parties</u>

23.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, members, and general and limited partners of the Receivership Defendants, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver, and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

25.     In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he

deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the Commission.

26. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Defendants. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Defendants, mail addressed any individual Receivership Defendants' spouse, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee or addressee's attorney by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

27. Subject to payment for services provided, any entity or utility furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to

14

the contrary by the Receiver.

28. The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of the Receivership Defendants, or their officers, directors, agents, employees, or trustees, and to take any and all appropriate steps in connection with such policies.

## VII. Injunction Against Interference with Receiver

29. The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile, or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

B. Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Assets, enforcing judgments, assessments or claims against any Receivership Assets or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Assets;

D. Transact any of the business of the Receivership Defendants or transferring any Receivership Assets to anyone other than the Receiver;

E. Destroy, secrete, deface, transfer, or otherwise alter or dispose of any

documents of or pertaining to the Receivership Defendants and to the extent any such documents are no longer in existence, fail to disclose the nature and contents of such documents and how, when and by whom such documents were caused to no longer be in existence;

F.  Fail to notify the Receiver of any Receivership Assets, including accounts constituting Receivership Assets held in any name other than the name of a Receivership Defendant, or by any Person other than the Receivership Defendants, or fail to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such Receivership Assets;

G.  Refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their powers, duties or authority under any order of this Court; or,

H.  Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

30.  The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

31.  The Receiver shall promptly notify the Court and Commission counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VIII.  <u>Stay of Litigation</u>

32.  As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

16

33.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.  Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.  Managing Assets

35.     The Receiver shall establish one or more accounts at a federally insured bank to receive and hold all cash and cash equivalent Receivership Assets (the "Receivership Funds").

36.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of [Receivership Defendant]" together with the name of the action, or a title to that effect.

37.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Assets, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Assets.

38.     Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most

beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

39.     Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estate.

40.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

41.     The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable, whether proposed, temporary or final, or pronouncements thereunder, including the filing of the elections and statements contemplated by those provisions.  The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a taxpayer identification number, (b) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon, and (c) satisfying any information, reporting or withholding requirements imposed on distributions from the Settlement Fund.  The Receiver shall cause the Settlement Fund to pay taxes in a manner consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."  The Receivership Defendants shall cooperate with the Receiver in fulfilling the Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## X.  Investigate and Prosecute Claims

42.     Subject to the requirement, in Section VI above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered and directed to investigate, prosecute, institute, defend, appears in, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with Commission counsel, be advisable or proper to recover and/or conserve Receivership Assets or that the Receiver deems necessary and advisable to carry out the Receiver's powers and duties under this Order.

43.     Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate, also may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order.  Where appropriate, the Receiver should provide prior notice to counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Defendants.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI.  Repatriation of Foreign Assets and Documents

46.    The Receiver shall take such steps as are necessary to repatriate to the territory of the United States of America all Receivership Assets that are located in a country other than the United States and are held by or for Defendants or are under Defendants' direct or indirect control, jointly, severally, or individually.

47.    Immediately and without delay, following the entry of this Order, and in no event later than within three (3) business days following entry of this Order, Jerome Cohen and Shaun Cohen shall provide the Receiver and the Commission with a full accounting of all assets, including Receivership Assets, that are located outside of the United States that have been transferred to the United States and are held by or for any Defendant or are under any Defendants' direct or indirect control, jointly, severally, or individually, including the addresses and names of any foreign or domestic financial institution or other entity holding the assets, along with the account numbers and balances.

48.    Jerome Cohen and Shaun Cohen shall take all steps necessary and appropriate to prevent any transfer, disposition, or dissipation whatsoever of any assets, including Receivership Assets, located outside the United States.

49.    Immediately and without delay, following entry of this Order, Jerome Cohen and Shaun Cohen shall provide the Receiver and the Commission access to Defendants' records and documents held by financial institutions or other entities outside the United States, by signing and delivering to the Receiver and Commission's counsel a Consent to Release of Financial Records.  In furtherance of the foregoing repatriation provisions, the Receivership Defendants, their successors and assigns, and their officers, agents, servants, employees, affiliates, and attorneys, and all persons and entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined from taking any

20

action, directly or indirectly, which may result in the encumbrance or dissipation of foreign Receivership Assets, or in the hindrance of the repatriation required by this Order, including but not limited to:

      A.    sending any statement, letter, fax, e-mail or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Receivership Assets have been fully repatriated pursuant to this Order; and

      B.    notifying any trustee, trust protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to court order, until such time that all Receivership Assets have been fully repatriated pursuant to this Order.

## XII.  Interference with Repatriation

50.    Defendants are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, that may result in the encumbrance or dissipation of foreign assets, including Receivership Assets, or in the hindrance of the. repatriation required by the preceding Section XI of this Order, including but not limited to:

    A.    Sending any statement, letter, facsimile, email or wire transmission, or telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under

21

the terms of a foreign trust agreement, until such time that the assets have been fully
repatriated pursuant to the preceding Section XI of this Order; and

B.     Notifying any trustee, protector, or other agent of any foreign trust or other related
entities of either the existence of this Order or the fact that repatriation is required
pursuant to a Court Order, until such time as assets, including Receivership Assets, have
been fully repatriated pursuant the preceding Section XI of this Order.

### XIII.  Bankruptcy Filing

51.     The Receiver may seek authorization of this Court to file voluntary petitions for
relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership
Defendants, or any of them.  If a Receivership Defendant is placed in bankruptcy proceedings,
the Receiver may become, and may be empowered to operate the Receivership Estate as, a
debtor-in-possession.  In such a situation, the Receiver shall have all of the powers and duties as
provided a debtor-in-possession under the Bankruptcy Code to the exclusion of any other person
or entity.  Pursuant to Paragraph 4 above, the Receiver is vested with management authority for
all entity Receivership Defendants and may therefore file and manage a Chapter 11 petition.

52.     The provisions of Section VII above bar any person or entity, other than the
Receiver, from placing any of the Receivership Defendants in bankruptcy proceedings.

### XIV.  Liability of Receiver

53.     Until further Order of this Court, the Receiver shall not be required to post bond
or give an undertaking of any type in connection with his fiduciary obligations in this matter.

54.     The Receiver may choose, engage and employ attorneys, accountants, appraisers,
and any other independent contractors and technical specialists, including, but not limited to,
securities traders, registered representatives, financial or business advisers, liquidating agents,

real estate agents, forensic experts, property managers, brokers, traders, and auctioneers (collectively, "Retained Personnel") as the Receiver deems advisable or necessary in the performance of the Receiver's duties and responsibilities under the authority granted by this Order. The Receiver and his Retained Personnel, acting within the scope of such agency are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

55.     No action shall be filed or proceeding commenced against the Receiver or the Retained Personnel arising out of or in any way related to this receivership or their duties or work performed in connection with the receivership without obtaining an order from the Court based upon a showing of good cause. Nothing contained in this Order, nor the grant or exercise of any powers provided for herein by the Receiver shall cause said Receiver to be considered a past or present owner, operator or other potentially responsible or liable party pursuant to any provision of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.; the Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12-8-90, et seq.; or incur liability based on ownership or operation of the Receivership Assets pursuant to any other statutory, regulatory, common law or strict liability theory. Furthermore, to the extent hazardous substances, wastes or constituents are known or discovered to be present upon the Receivership Assets, the Receiver shall not be considered to be in any direct or indirect

23

contractual relationship with any party responsible for such substances, wastes or constituents pursuant to CERCLA and/or HSRA, and shall instead be considered to be acting solely in a "fiduciary capacity" with respect to the Receivership Assets, pursuant to 42 U.S.C. § 107(n) of CERCLA and §12-8-92(7)(C) of HSRA.

56.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

57.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.

## XV.  <u>Insurance</u>

58.     Given the urgency to appoint a Receiver, the Court recognizes that the Receiver accepts this appointment without time for independent verification that appropriate insurance is in place on the property or that appropriate liability or other insurance is in place to protect the Receivership Assets and the Receivership Estate.  Accordingly, the Court acknowledges that the Receiver has no responsibility or liability until such time as he can confirm that such insurance is in place or acquire the appropriate insurance.  The Receiver shall make it a priority to verify or obtain insurance coverage immediately upon this Order Appointing Receiver being entered; however, the Plaintiff, Receivership Defendants, and Court acknowledge there may be a gap of time before such insurance may be in place to properly protect the assets of the estate and any employees of the estate, and that the Receiver has no responsibility or liability until such time as he/it has notified the Court by filing a notice that insurance is in place.

59.     Jerome Cohen and Shaun Cohen are ordered to immediately provide the Receiver with all available insurance information for both existing and prior insurance policies.  This

includes all applications, policies, riders, correspondence, endorsements, claims and other information.  Jerome Cohen and Shaun Cohen are ordered:  (1) to advise the insurance agent(s) of this Order in writing, (2) designate all authority over the policies to the Receiver, and (3) take no action with regard to terminating or modifying existing insurance policies.

60.     Any insurance broker, agent, carrier, or underwriter is specifically ordered by the Court to cooperate with the Receiver by timely furnishing the following:  (1) copies of all insurance policies including any riders, endorsements and applications with respect to policies related to the Receivership Estate, (2) loss history for five consecutive years or for as long as insurance has been in force if less than five years, (3) premium payment history including current status, and (4) any correspondence with insurance agents, brokers and companies.  Policies shall be endorsed by the Defendants naming the Receiver as Named Insured and Loss Payee effective the date of this Order as appropriate to the type of coverage, and evidence of this policy endorsement shall be promptly supplied to the Receiver.

61.     The Receiver is hereby authorized to engage insurance brokers and consultants as necessary to properly insure the Receivership Assets

## XVI.  Recommendations and Reports

62.     The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Assets (the "Liquidation Plan").

63.     Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

64.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status

Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

     65.    The Quarterly Status Report shall contain the following:

        A.    A summary of the operations of the Receiver;

        B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

        C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

        D.    A description of all known Receivership Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

        E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

        F.    A list of all known creditors with their addresses and the amounts of their claims;

        G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

        H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

     66.    On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further

the Commission's mission.

## XVII.  Fees, Expenses and Accountings

67.     Subject to Paragraphs 68 – 74 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

68.     Subject to Paragraph 69 below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

69.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

70.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications").  The Receiver may file a fee application at the end of September 2018, November 2018, and January 2019, which otherwise must comply with the requirements of this Order that are applicable to Quarterly Fee Applications.  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by

Commission staff.

71.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

72.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

73.     Each Quarterly Fee Application shall:

     A.    Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

     B.    Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

74.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by Commission staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED, this 17th day of August, 2018, at Chicago, Illinois**

_____

**John Z. Lee**
**UNITED STATES DISTRICT JUDGE**

Entered: 8/17/18

29